(293 P.3d 757)
No. 106,600

STATE OF KANSAS, *Appellee*, v. BRANDON CASTLEBERRY,
*Appellant*.

Opinion filed January 18, 2013.

*Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Vernon E. Buck*, first assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., GREEN, J., and LARSON, S.J.

STANDRIDGE, J.: Brandon Castleberry appeals from convictions against him for obstruction of official duty, distribution of methamphetamine, unlawful use of a communication facility to arrange a drug sale, failure to affix a drug tax stamp, and fleeing or attempting to elude a police officer. For the reasons stated below, we affirm each of Castleberry's convictions.

## FACTS

On June 10, 2010, Emporia Police Officer Lance Delgado stopped a vehicle driven by Mark Foltz and discovered that Foltz and his passenger were in possession of methamphetamine. In order to prevent his own prosecution, Foltz agreed to make a controlled purchase of methamphetamine from Castleberry. From the Emporia police station, Foltz used his cell phone to place two calls to Castleberry, both of which were monitored and recorded by law enforcement. During the course of the first conversation, Foltz and Castleberry discussed "going fishing," which Foltz explained to police was code for a methamphetamine purchase. During the second conversation, Foltz and Castleberry agreed to meet at Peter Pan Park in Emporia.

The police set up video camera surveillance at the park, secured a wireless transmitter on Foltz, and provided him with $600 in cash to purchase the metham-phetamine. An officer followed Foltz to the park and, in addition to that officer, several other officers later observed Castleberry pull up next to Foltz. After 3 to 5 minutes, Foltz and Castleberry parted ways and separately left the park. Both Foltz and Castleberry were followed by the police. When Foltz arrived back at the Emporia police station, he turned over a Marlboro cigarette box containing two plastic baggies with a substance that was later confirmed to be methamphetamine. Foltz reported he had given Castleberry $600 in exchange for the drugs.

When the police officers following Castleberry attempted to pull him over, he sped up and led the officers on a high-speed chase outside the city limits. The chase lasted approximately 45 minutes, during which Castleberry ran multiple stop signs and traffic lights. Castleberry eventually came to a stop and exited his vehicle. He ignored officers' warnings to get down on the ground, put his hands up in what officers believed to be a taunting and aggressive manner, and told the officers to shoot him. Officer Delgado ultimately tased Castleberry and took him into custody.

Castleberry was charged with one count each of aggravated assault of a law enforcement officer, obstructing legal process or official duty, distribution of methamphetamine, unlawful use of a

communication facility to arrange a drug sale, failure to affix a drug tax stamp, fleeing or attempting to elude a law enforcement officer, and reckless driving.

At trial, Castleberry denied that he provided methamphetamine to Foltz in exchange for money. Castleberry testified that he and Foltz occasionally went fishing together and that he believed both of their June 10, 2010, phone conversations were related to fishing. Castleberry claimed they always met at an agreed upon location before going fishing because they would take Foltz' car. Castleberry testified that before meeting Foltz at the park on the day in question, he received a text from Foltz' girlfriend, Stacy Ragsdale, who said Foltz had been "busted" by police and was in jail. On his way to the park, Castleberry called Ragsdale and told her that Foltz could not be in jail because he was on his way to meet Foltz. When he pulled up beside Foltz in the car, Castleberry gave the phone to Foltz so Foltz could talk to Ragsdale. After Foltz got off the phone, he told Castleberry that he could not go fishing that day and suggested they go another time. Castleberry reported that they each left the park separately.

As Castleberry was leaving the park, he noticed a police officer following him and "panicked" because he just then realized he had associated with someone who allegedly had been caught with drugs. Castleberry decided to "take off" and leave town; he finally stopped his car after talking to his mother and a friend, who convinced him that he needed to pull over. Castleberry testified that after he stopped his car, he found himself surrounded by five or six police cars and could not hear anything due to all the sirens. Castleberry reported that he threw his keys down, put his hands up in the air, and told the officers not to shoot. Castleberry denied resisting arrest and claimed that his large size, combined with the stress of being tased, made it hard to get his hands behind his back, which caused the officers difficulties in trying to handcuff him.

After the close of evidence, the State dismissed the reckless driving charge. After deliberation, the jury acquitted Castleberry of aggravated assault of a law enforcement officer but found him guilty of obstructing official duty, distributing methamphetamine, illegal use of a communication facility, failure to affix a drug tax

stamp, and fleeing or attempting to elude a police officer. The district court sentenced Castleberry to a controlling prison term of 61 months.

### ANALYSIS

On appeal, Castleberry argues: (1) The evidence was insufficient to convict him of unlawful use of a communication facility to arrange a drug sale; (2) the district court erred in failing to instruct the jury on the specific offenses that constitute moving violations for the fleeing and eluding charge; (3) the district court erred in failing to give a unanimity instruction on the obstruction of official duty charge; (4) the State failed to present sufficient evidence on each of the alternative means of committing the crime of distribution of methamphetamine; and (5) the district court erred in enhancing his sentence based on criminal history without proving it to a jury beyond a reasonable doubt. We address each of Castleberry's arguments in turn.

### I. *Sufficiency of the Evidence: Unlawful Use of a Communication Facility*

Castleberry challenges the sufficiency of the evidence supporting his conviction in Lyon County of unlawfully using a communication facility to distribute methamphet-amine. Specifically, he contends the State failed to prove that he committed this crime in Lyon County, which necessarily renders Lyon County an improper venue for the charge against him.

Venue is a necessary jurisdictional fact that must be proven along with the elements of the actual crime. See *State v. Rivera*, 42 Kan. App. 2d 1005, 1008-10, 219 P.3d 1231 (2009), *rev. denied* 290 Kan. 1102 (2010). Because venue is jurisdictional and implicates the district court's subject matter jurisdiction, our standard of review is de novo. *State v. Jackson*, 280 Kan. 16, 20, 118 P.3d 1238 (2005), *cert. denied* 546 U.S. 1184 (2006); see *State v. Calderon-Aparicio*, 44 Kan. App. 2d 830, 836-41, 242 P.3d 1197 (2010), *rev. denied* 291 Kan. 913 (2011). In this case, resolution of the venue issue also involves interpretation of K.S.A. 2010 Supp. 21-36a07, which

is subject to de novo review. See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

We begin our discussion of venue with K.S.A. 22-2602, the statutory authority for conferring venue in criminal prosecutions. This statute authorizes the State to prosecute a crime in the county where the crime was committed. Where two or more acts are requisite to the commission of the crime charged and such acts occur in different counties, however, K.S.A. 22-2603 authorizes the State to prosecute the crime "in any county in which any of such acts occur."

In this case, Castleberry was charged in Lyon County with unlawful use of a communication facility in violation of K.S.A. 2009 Supp. 21-36a07. This statute prohibits the knowing or intentional use of a communication facility to commit, cause, or facilitate the unlawful manufacture, distribution, cultivation, or possession of a controlled substance. At the close of evidence, the jury was instructed that in order to find Castleberry guilty of this crime, the State was required to prove:

"1. That the defendant intentionally used a cell phone in committing, causing the actual commission of, or facilitating the actual commission of distribution of Methamphetamine; and

"2. That this act occurred on or about the 10th day of June, 2010, in Lyon County, Kansas."

Castleberry argues the second part of this jury instruction requires the State to prove that he was physically present in Lyon County when he used the cell phone. In support of this argument, Castleberry cites *State v. Price*, No. 92,012, 2005 WL 823912 (Kan. App.) (unpublished opinion), *rev. denied* 280 Kan. 989 (2005). In *Price*, the defendant was charged with illegal use of a communication facility to arrange a sale of a controlled substance. At trial, the State presented evidence that Denise Mullins had called the defendant from an apartment in Atchison County, but the record was silent as to the defendant's location when he received the call. The State alleged that Mullins' use of a telephone in Atchison County was sufficient to satisfy the venue element, relying on K.S.A. 22-2603. A panel of this court rejected the State's argument, stating:

"Apparently, the argument is that Mullins' use of the Atchison County telephone to call Price was a required element to convict him of unlawful use of a telephone to commit or facilitate the commission of possession of marijuana with intent to sell. We are unpersuaded that Mullins' act in Atchison County was an element of Price's crime." 2005 WL 823912, at *3.

The *Price* court reversed the defendant's conviction, holding that the evidence did not support the required venue element of the crime. 2005 WL 823912, at *3. The State claims *Price*—an unpublished decision with no precedential value—was wrongly decided. For purposes of venue, the State asserts the unlawful "use" of a cell phone under K.S.A. 2009 Supp. 21-36a07 is not limited solely to the county where the defendant was physically located when the call was made or received, but instead is unlawfully "used" in both the county where the call was made and the county where the call was received.

In order to address the State's claim, we must review the statute itself. Interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Dale*, 293 Kan. 660, 662, 267 P.3d 743 (2011). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Collins*, 294 Kan. 780, 782, 280 P.3d 763 (2012). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Urban*, 291 Kan. 214, 216, 239 P.3d 837 (2010).

K.S.A. 2009 Supp. 21-36a07(a) states: "It shall be unlawful for any person to knowingly or intentionally use any communication facility . . . ." In the context of this sentence, the term "use" is a transitive verb meaning "to put into action or service." See Webster's Third New International Dictionary 2523 (1993). As a transitive verb, it requires and places emphasis on an object. See Chicago Manual of Style 172 (15th ed. 2003) ("A transitive verb requires an object to express a complete thought; the verb indicates what action the subject exerts on the object."). Focus on the object—in this case, a communication facility—is therefore critical to giving full effect to the term "use."

To that end, K.S.A. 2009 Supp. 21-36a07(c) defines "communication facility" as "any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures or sounds of all kinds and includes telephone, wire, radio, computer, computer networks, beepers, pagers and all other means of communication." Reading the two subsections in conjunction with each other, K.S.A. 2009 Supp. 21-36a07(a), (c) makes it unlawful for any person to "use" any communication instrumentality "used or useful in the transmission of writing, signs, signals, pictures or sounds of all kinds." Given the statute specifically requires that the instrumentality be one that is used or useful in transmitting signals and sounds of all kinds, we believe the legislature intended the act of using any communication instrumentality (in this case a cell phone) to include the transmission of information from one party to another. That is, although the act of using a cell phone technically may require only unilateral conduct, the language of the statute substantively requires the act of using that cell phone to be made for purposes of communicating information from one person to another. For venue purposes, then, we conclude as a matter of law that "use" of a communication facility in violation of K.S.A. 2009 Supp. 21-36a07(a) occurs simultaneously where the parties to the communication are located. Having so concluded, we are ready to apply the law to the facts presented in this case.

The record does not indicate whether Castleberry was in Lyon County when he received Foltz' phone calls. There is no dispute, however, that Foltz made the phone calls from Lyon County. Because an act requisite to Castleberry's commission of the crime of unlawful use of a communication facility was committed in Lyon County, we hold the district court properly exercised subject matter jurisdiction over the offense and the State presented sufficient evidence that Castleberry committed the crime in Lyon County.

## II. *Instructing the Jury on the Charge of Fleeing and Eluding a Police Officer*

With regard to the charge of fleeing and eluding, Castleberry claims the district court erred in failing to instruct the jury on the specific offenses that could constitute moving violations. Castle-

berry did not request the instruction he now asserts should have been provided.

"K.S.A. 22-3414(3) establishes a preservation rule for instruction claims on appeal. It provides that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included crime instruction, unless: (a) that party objects before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds for objection; or (b) the instruction or the failure to give the instruction is clearly erroneous. If an instruction is clearly erroneous, appellate review is not predicated upon an objection in the district court." *State v. Williams*, 295 Kan. 506, Syl. ¶ 3, 286 P.3d 195 (2012).

In determining whether an instruction or a failure to give an instruction was clearly erroneous, an appellate court must first determine whether there was any error at all. To make that determination, "the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." 295 Kan. 506, Syl. ¶ 4. If the appellate court concludes the district court erred in giving or failing to give a challenged instruction, the clearly erroneous analysis moves to a reversibility inquiry, wherein the court assesses "whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred." 295 Kan. 506, Syl. ¶ 5.

K.S.A. 2009 Supp. 8-1568(a) prohibits a driver from willfully failing or refusing to bring his or her motor vehicle to a stop for a pursuing police officer when the driver is given a visual or audible signal to do so. A first-time conviction of fleeing or attempting to elude is a class B misdemeanor. K.S.A. 2009 Supp. 8-1568(a) and (c)(1). The statute elevates the crime to a severity level 9 person felony when certain circumstances occur during the pursuit. These circumstances include when the driver engages in reckless driving or commits five or more moving violations during a police pursuit. K.S.A. 2009 Supp. 8-1568(b)(1)(C), (b)(1)(E), and (c)(4).

The jury was instructed that in order to find Castleberry guilty of felony fleeing or attempting to elude a police officer, the State was required to prove:

"1. That the defendant was driving a motor vehicle; and

"2. That the defendant was given a visual or audible signal by a police officer to bring the motor vehicle to a stop; and

"3. That the defendant intentionally failed or refused to bring the motor vehicle to a stop, or otherwise fled or attempted to elude a pursuing police vehicle; and

"4. That the police officer giving such a signal was in uniform, prominently displaying such officer's badge of office; and

"5. That the police officer's vehicle was appropriately marked showing it to be an official police vehicle; and

"6. That the defendant *engaged in reckless driving or committed five or more moving violations*[; and]

"7. That this act occurred on or about the 10th day of June, 2010 in Lyon County, Kansas.

"The elements of reckless driving are as follows:

1. That the defendant was driving a vehicle;

2. That the defendant was driving in a reckless manner[.]

"Reckless means driving a vehicle under circumstances that show a realization of the imminence of danger to another person or the property of another where there is a conscious and unjustifiable disregard of that danger." (Emphasis added.)

Although the instruction did not define the phrase "moving violation," the jury was provided with a unanimity instruction, which read:

"The State claims distinct multiple acts which each could separately constitute the crime of fleeing or attempting to elude a law enforcement officer. In order for the defendant to be found guilty of fleeing or attempting to elude a police officer, you must unanimously agree upon the same underlying act[s]."

As Castleberry asserts, the jury was instructed on two alternative theories of fleeing and eluding: reckless driving or committing five or more moving violations. As Castleberry also asserts, the phrase "moving violations" in the second alternative was not defined for the jury. In the absence of such a definition, Castleberry argues it is impossible to know which specific acts the jury unanimously relied on to support his conviction and, in turn, it is impossible to know whether the specific acts relied upon qualify as moving violations—as opposed to nonmoving traffic infractions—as a matter of law. For support, Castleberry relies on *State v. Richardson*, 290 Kan. 176, 224 P.3d 553 (2010).

In *Richardson*, a police officer attempted to stop Richardson for a traffic violation. Richardson did not stop but sped away, resulting in a police pursuit. During the pursuit, Richardson committed a

number of traffic violations. The State charged Richardson with, among other things, felony fleeing or attempting to elude the officer while committing at least five moving violations. The jury convicted Richardson of felony fleeing or attempting to elude.

On appeal, a panel of this court held the court's failure to instruct the jury on the specific underlying moving violations and their respective elements was erroneous. The court reasoned that in the absence of instructions specifying which of Richardson's various traffic infractions constituted moving violations, the jury may have found Richardson guilty of a traffic infraction that was not a moving violation. Applying a clearly erroneous standard of review, however, the panel determined that—in light of the overwhelming evidence of Richardson's 14 moving violations—there was no real likelihood that the jury could have returned a different verdict. As a result, this court affirmed Richardson's conviction for felony fleeing or attempting to elude. *State v. Richardson*, 40 Kan. App. 2d 602, 610-11, 194 P.3d 599 (2008), *aff'd in part and rev'd in part* 290 Kan. 176.

On review, our Supreme Court agreed that the failure to instruct the jury on the specific underlying moving violations was erroneous, but it disagreed with this court's application of the clearly erroneous standard. *Richardson*, 290 Kan. at 181-82. Rather, the Supreme Court observed that when district courts err by omitting an element of a crime, Kansas courts apply a harmless error analysis. Under this standard of review, an appellate court looks to "whether the omitted element was uncontested and supported by such overwhelming evidence that the jury verdict would have been the same without the omission." 290 Kan. at 182. Ultimately, the Supreme Court held that the trial court's error in failing to instruct the jury with definitions of at least five underlying moving violations was not harmless and reversed the conviction. 290 Kan. 182-84. The Supreme Court noted that when conducting a harmless error review, an appellate court may not "speculate with legal finality which of a wide range of conduct, some legal and some illegal, a jury elected to consider moving violations." 290 Kan. at 183. The court reasoned:

"This court cannot know whether the jury found that Richardson committed at least five moving violations, since they were not identified or defined to the jury, and we do not know which specific acts the jury deemed to be moving violations. It may be that the jury included speeding violations that are excluded from the list of moving violations compiled by the Kansas Department of Revenue. It may also be that the jury included acts that are not even statutory infractions . . . .

"We will not step into the shoes of the jurors and convict Richardson of five moving violations of our choice—the jury did not make the necessary determination of guilt beyond a reasonable doubt on all the elements of the crime charged. The failure to provide the jury with instructions specifying and defining at least five underlying moving violations as elements of the fleeing or attempting to elude crime charged against Richardson constitutes clear error, and we reverse . . . ." 290 Kan. at 183.

In light of the holding in *Richardson*, we find the district court's failure to provide the specific elements of each kind of moving violation at issue in the case was error. Accordingly, we now must determine whether there exists "a real possibility that the jury could have rendered a different verdict had the trial error not occurred." See 290 Kan. at 182. In making this determination, we must examine the record "to determine whether the omitted element was uncontested and supported by such overwhelming evidence that the jury verdict would have been the same without the omission." 290 Kan. at 182.

Before undertaking this examination, we find it helpful to consider the definition of the term "moving violation." Kansas statutes and administrative regulations provide various definitions for the term. In the context of regulating motor carriers, the Kansas Corporation Commission defines moving violation as "the commission or omission of an act by a person operating a motor vehicle that could result in injury or property damage and that is also a violation of a statute, ordinance, or regulation of this state or any other jurisdiction." K.A.R. 82-4-1(t). In the context of regulating drivers' licenses, the Kansas Department of Revenue lists specific statutory violations that qualify as moving violations. K.A.R. 92-52-9(a). In lieu of providing an exhaustive definition, K.S.A. 2009 Supp. 8-1560c identifies certain traffic violations that are excluded from the definition of "moving violations," including any speeding offense within 6 to 10 miles per hour over the applicable speed limit.

In this case, there was no evidence to establish that Castleberry committed a traffic infraction excluded from the definition of moving violation under K.S.A. 2009 Supp. 8-1560c. The evidence at trial included testimony from Officer Delgado that Castleberry drove through at least eight intersections controlled by a stop sign or stop light and drove at speeds over 100 miles per hour and as high as 120 miles per hour. Castleberry did not dispute this evidence and admitted his speedometer indicated that he was driving over 100 miles per hour.

Even if the more restrictive definition of "moving violation" found at K.A.R. 92-52-9(a) is considered, all of the offenses described by Officer Delgado constitute moving violations. See K.A.R. 92-52-9(a)(1)(I) (traffic control obedience under K.S.A. 8-1507); K.A.R. 92-52-9(a)(1)(Q) (minimum and maximum speed limits under K.S.A. 8-1560b). The only evidence of speeding presented in this case was driving at speeds over 100 miles per hour, which rules out conduct that would fall within the exclusion of K.S.A. 2009 Supp. 8-1560c. Thus, regardless of the traffic offenses presented at trial upon which the jury relied to support Castleberry's conviction for felony fleeing or attempting to elude, they all constituted moving violations. As such, we find the instructional error had no effect on the verdict for this conviction and therefore was not clearly erroneous. A panel of this court recently reached a similar conclusion in *State v. Cordova-Hipolito*, No. 103,793, 2011 WL 3658368, at *3-4 (Kan. App. 2011) (unpublished opinion), *rev. denied* 293 Kan. 1109 (2012).

III. *Instructing the Jury on the Obstruction of Official Duty Charge*

Castleberry alleges the State presented evidence of multiple acts that could have supported the charge of obstruction of official duty, which necessarily means the district court erred in failing to give a unanimity instruction on that charge.

A defendant is entitled to a unanimous jury verdict. See K.S.A. 22-3421; *State v. Stevens*, 285 Kan. 307, 313, 172 P.3d 570 (2007). A multiple acts case is one in which several distinct and separate acts are alleged, any one of which could constitute the crime

charged. In a case involving multiple acts, unless the State elects what act it is relying on to base a conviction, a unanimity instruction is required to make sure the jurors understand that they must unanimously agree on the act constituting the crime. See *State v. Colston*, 290 Kan. 952, 968-69, 235 P.3d 1234 (2010); *State v. Sanborn*, 281 Kan. 568, 569, 132 P.3d 1277 (2006). Whether a case involves multiple acts is a question of law over which appellate courts have unlimited review. *State v. Kesselring*, 279 Kan. 671, 682, 112 P.3d 175 (2005).

The jury was instructed that in order to find Castleberry guilty of obstructing official duty, the State was required to prove:

"1. That Officer Lance Delgado was discharging an official duty, namely the arrest of the defendant;

"2. That the defendant knowingly and intentionally obstructed Officer Lance Delgado in the execution of the arrest;

"3. That the act of the defendant substantially hindered or increased the burden of the officer in the performance of the officer's official duty;

"4. That at the time the defendant knew or should have known that Officer Lance Delgado [was] a law enforcement officer; and

"5. That this act occurred on or about the 10th day of June, 2010, in Lyon County, Kansas."

Castleberry contends the State presented two distinct acts, each of which could have been used to support the obstruction of official duty charge: (1) He fled from police in a high-speed chase, and (2) officers had to tase and struggle with Castleberry in order to handcuff and arrest him. The State disagrees with this characterization and maintains that Castleberry's actions in fleeing from law enforcement and Delgado's subsequent use of the taser on Castleberry constituted a continuous, unbroken chain of events.

In *State v. Voyles*, 284 Kan. 239, 160 P.3d 794 (2007), the Kansas Supreme Court set out a three-part test to determine when a multiple acts situation has occurred such that the jury must agree on the same underlying criminal act. First, the court must determine if the case truly involves multiple acts, *i.e.*, whether the defendant's conduct was part of one act or represents multiple acts which are separate and distinct from each other. Second, the court must consider whether error occurred, *i.e.*, whether there was a failure by

the State to elect an act or a failure by the trial court to instruct. Third, the court must determine whether the error is reversible. 284 Kan. at 252-53.

*Step 1—Is this a multiple acts case?*

The threshold question in a multiple acts analysis is whether the defendant's conduct is part of one act or represents multiple acts that are separate and distinct from each other. There is no single test for whether conduct constitutes one act or separate and distinct multiple acts; rather, the courts must look to the facts and the theory of the crime as argued to determine whether a jury verdict implicates unanimity issues. *State v. Allen*, 290 Kan. 540, Syl. ¶¶ 1, 2, 232 P.3d 861 (2010).

Factors for determining if there is unitary conduct in a multiple acts case include: "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." *State v. Schoonover*, 281 Kan. 453, 507, 133 P.3d 48 (2006). Additionally,

" '[i]ncidents are legally separate when the defendant presents different defenses to separate sets of facts or when the court's instructions are ambiguous but tend to shift the legal theory from a single incident to two separate incidents. Incidents are factually separate when independent criminal acts have occurred at different times or when a later criminal act is motivated by "a fresh impulse." ' [Citation omitted.]" *Allen*, 290 Kan. at 543.

We find Castleberry's conduct here—fleeing from law enforcement, stopping his vehicle, being tased, and being taken into custody—amounts to one continuous act in which Castleberry substantially hindered or increased the burden of the law enforcement officers who were trying to effect his arrest. Although the entire incident started in one location, ended in another, and took place over a time period of approximately 45 minutes, Castleberry's actions reflect a seamless and singular occurrence, undistinguished by any intervening event or fresh impulse. See *Kesselring*, 279 Kan. at 683 (length of time involved did not prevent a finding of a continuous incident, and moving of a kidnapping victim from one lo-

cation to a car and from the car to another location did not constitute separate acts). The jury instruction was consistent with this concept of one continuous act and did not shift the legal theory to two separate incidents. Moreover, the record does not reflect that Castleberry raised different defenses to his actions prior to or during the chase and after he stopped his car. Castleberry testified that he initially fled from law enforcement because he "panicked" and he continued to be in a state of panic during the entire chase. Castleberry generally denied any aggressive behavior that occurred after he stopped his car and was arrested.

Because Castleberry's actions of fleeing from law enforcement and struggling with law enforcement prior to his arrest do not constitute multiple acts, his argument fails to survive the threshold question under the *Voyles* analysis.

*Step 2—Did the district court err?*

Even if this court were to determine that Castleberry's actions constituted multiple acts, he cannot show that the district court erred under the second step of the *Voyles* test.

In a multiple acts case, either the State must inform the jury which act to rely upon in its deliberations or the court must instruct the jury to agree on the specific criminal act. The failure to either instruct or elect is error. *Voyles*, 284 Kan. 239, Syl. ¶ 2. In this case, the district court did not instruct the jury to agree on the specific criminal act supporting the obstruction charge. Therefore, we must determine whether the State properly informed the jury which act to rely upon to support the obstruction conviction.

During closing argument, the prosecutor stated:

"As far as obstruction of official duty, we maintain that happened the minute that he ran from Lance Delgado in Emporia, continued along the route that they took out through Lyon County, North Lyon County, Kansas, until he stopped south of Americus. The actions that he took constituted both obstruction of official duty and fleeing and eluding."

Castleberry argues that because the prosecutor failed to specifically exclude anything that took place after Castleberry stopped his car, the jury could have inferred that these actions also constituted a potential act of obstruction.

Castleberry's argument is without merit. The prosecutor's statements clearly informed the jury that to support the obstruction charge, the State was relying on Castleberry's actions in substantially hindering the law enforcement officers who were trying to effect his arrest, beginning when he fled from Delgado and ending when "he stopped south of Americus."

In sum, Castleberry's actions did not constitute distinct multiple acts. But even if they did, the district court was not required to provide the jury with a unanimity instruction because the State properly informed the jury which act to rely upon to support the obstruction charge.

## IV. *Alternative Means of Distributing Methamphetamine*

Castleberry argues that the definition of "distribute" provided to the jury establishes alternative means of committing the crime of distribution of methamphetamine and the State failed to present sufficient evidence at trial to support his conviction under one or more of these means.

A criminal defendant has a statutory right to a unanimous jury verdict on each individual offense charged. See *State v. Wright*, 290 Kan. 194, 201-03, 224 P.3d 1159 (2010). In an alternative means case—where a single offense may be committed in different ways—there must be jury unanimity as to guilt for the single offense but not as to the particular means by which the crime was committed so long as any means of committing the crime is supported by sufficient evidence. 290 Kan. at 202. If a case presents alternative means of committing the offense and the record does not provide sufficient evidence supporting each of the alternative means, the conviction must be reversed and the case remanded for a new trial. 290 Kan. at 205-06 (specifically disapproving of the harmless error analysis applied in *State v. Dixon*, 279 Kan. 563, 112 P.3d 883 [2005]).

Before addressing whether there was sufficient evidence to prove the alleged alternative means, however, we must first determine whether this case truly presents an issue of alternative means. If the offense of distribution of methamphetamine cannot be committed in more than one way, jury unanimity is not at issue and an

alternative means analysis is inapplicable. Resolution of this issue involves statutory interpretation which is a question of law over which an appellate court has unlimited review. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

The jury was instructed that in order to convict Castleberry of distribution of methamphetamine, the State was required to prove (1) Castleberry intentionally distributed methamphetamine (2) on or about June 10, 2010, in Lyon County, Kansas. The instruction further defined the term " '[d]istribute' " to mean "the actual, constructive, or attempted transfer of some item from one person to another, whether or not there is an agency relationship between them. 'Distribute' includes sale, offer for sale or any act that causes some item to be transferred from one person to another." This instruction is modeled on PIK Crim. 3d 67.32 and is consistent with the definition of "distribute" as set forth in K.S.A. 2009 Supp. 21-36a01(d), the statute in effect at the time of Castleberry's crime.

Castleberry contends the State failed to prove that he distributed methamphetamine by each of the alternative means of (1) actual, (2) constructive, or (3) attempted transfer. Although conceding the evidence was sufficient to support a finding that he actually—and even constructively—transferred methamphetamine to Foltz, Castleberry argues the State failed to prove that he *attempted* to transfer the methamphetamine because all the evidence showed that the transfer was successfully accomplished.

Although we could find no Kansas appellate decision discussing whether actual transfer and attempted transfer are alternative means of distributing controlled substances as defined by K.S.A. 2009 Supp. 21-36a01(d), we find persuasive the reasoning of another panel of this court that examined the same issue in the context of a different criminal statute. See *State v. Aguirre*, 45 Kan. App. 2d 141, 245 P.3d 1, *aff'd in part and rev'd in part* 296 Kan. 99, 290 P.3d 612 (2012). In *Aguirre*, the defendant was charged, among other things, with aggravated intimidation of a victim. Aguirre argued there were alternative means by which he could have committed the crime, including either (1) preventing or dissuading the victim from reporting the sexual abuse or (2) attempt-

ing to so prevent or dissuade the victim. The panel rejected Aguirre's argument.

"Normally, attempted crimes are distinct from completed crimes and constitute separate crimes. See K.S.A. 21-3301. However, K.S.A. 21-3833 defines aggravated intimidation of a victim or witness to encompass both the successful intimidation and the attempted but unsuccessful intimidation. By so doing, it is clear that whether the crime is committed is not a function of how effective the intimidation was. Rather, there is but one criminal act: to intimidate a victim or witness with the intent to deter the reporting of a crime, whether or not the intimidation is successful. One does not commit the crime of intimidating a witness by alternative means of either doing it or merely trying to do it.

". . . [W]hether the intimidation is successful or not, the gravamen of the statute is the act of intimidation.

"The charge in the complaint and the court's instructions did not present alternative means used by Aguirre to intimidate [the victim], leaving the possibility of different members of the jury settling on different conduct as a basis to convict. The crime as defined by the statute is completed at the time of the intimidation regardless of the results of the intimidation. Accordingly, the charge in the complaint and the court's instruction do not present a true alternative means issue." 45 Kan. App. 2d at 148-49.

The Supreme Court affirmed the conclusion that the statute involved did not present an alternative means issue and affirmed Aguirre's conviction. 296 Kan. at 110.

We find the *Aguirre* rationale is readily applicable to the statutory definition of "distribute." Using this rationale, we conclude actual transfer and attempted transfer do not present alternative means of distributing controlled substances under K.S.A. 2009 Supp. 21-36a01(d)(1). Our conclusion in this regard is consistent with the recent decision in *State v. Brown*, 295 Kan. 181, 284 P.3d 977 (2012), where our Supreme Court held that "options within a means," *i.e.*, options that do not state a material, distinct element, do not warrant application of the "alternative means rule/super-sufficiency requirement." 295 Kan. at 188, 196-97. Specifically, the *Brown* court ruled that definition statutes which merely describe a material element or a factual circumstance that would prove the crime are "options within a means" that do not create additional alternative means of committing an offense. 295 Kan. at 196-97.

Here, the statutory definition of "distribute" lists options within a means, as it merely describes the types of factual circumstances

that may prove the material element of "distribute." As such, it does not trigger concerns of jury unanimity or raise a sufficiency issue that requires us to examine whether these options are supported by evidence. See 295 Kan. at 196-200; see *State v. Waldrup*, 46 Kan. App. 2d 656, 669, 263 P.3d 867 (2011) (holding that "the district court's definitional jury instruction of the term 'sale' did not create alternative means of committing the crime of sale of cocaine" because the definition is "more aptly categorized as an explanatory definition rather than a fundamental definition of the crime itself"), *petition for rev. filed* November 16, 2011.

Castleberry concedes the State presented sufficient evidence that he actually or constructively transferred the methamphetamine to Foltz. Because the State was not also required to present evidence that Castleberry attempted to transfer the methamphetamine, he is not entitled to reversal of his distribution conviction on this issue.

## V. *Criminal History*

Finally, Castleberry challenges the district court's use of his prior convictions as reflected in his criminal history score to enhance his sentence based on the due process concerns of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Castleberry acknowledges that our Supreme Court has rejected his argument in *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002), but raises the issue in order to preserve it for federal review.

We are duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its previous position. *State v. Jones*, 44 Kan. App. 2d 139, 142, 234 P.3d 31 (2010), *rev. denied* 292 Kan. 967 (2011). Our Supreme Court continues to reaffirm its precedent in this area. See *State v. Barnes*, 293 Kan. 240, 265, 262 P.3d 297 (2011). Therefore, the district court did not violate Castleberry's constitutional rights at sentencing.

Affirmed.