No. 106,600

STATE OF KANSAS, *Appellee*, v. BRANDON CASTLEBERRY, *Appellant*.

(339 P.3d 795)

Opinion filed December 24, 2014.

*Heather R. Cessna*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jonathan L. Noble*, assistant county attorney, argued the cause, and *Vernon E. Buck*, first assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Brandon Castleberry seeks review of the Court of Appeals' decision affirming his jury trial convictions and sentence for obstruction of official duty, distribution of methamphetamine, unlawful use of a communication facility to arrange a drug sale, failure to affix a drug tax stamp, and fleeing or attempting to elude a police officer. *State v. Castleberry*, 48 Kan. App. 2d 469, 293 P.3d 757 (2013). Castleberry arranged to sell methamphetamine to a police informant in a telephone conversation and then, after effecting the sale in a park, led police on a high-speed chase before being subdued and arrested.

On petition for review from the Court of Appeals, Castleberry argues: (1) The State failed to establish that Castleberry used a communication facility in Lyon County so as to establish venue on

that charge; (2) the district court's failure to instruct the jury on the definition of a moving violation for purposes of fleeing and eluding was clearly erroneous; (3) the district court's failure to give a unanimity instruction on the obstruction of official duty charge was clearly erroneous; (4) the State presented insufficient evidence on all of the instructed alternative means of committing distribution of methamphetamine; and (5) the district court violated his rights to the Sixth and Fourteenth Amendments to the United States Constitution when it sentenced him to an increased sentence based upon his criminal history without requiring the State to prove it to a jury beyond a reasonable doubt. Finding no reversible error, we affirm Castleberry's convictions and sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 10, 2010, to avoid being prosecuted on unrelated charges, Mark Foltz agreed to assist law enforcement officers by making a controlled purchase of methamphetamine from Brandon Castleberry. While at the Emporia Police Department, Foltz made two recorded cell phone calls to Castleberry. In the first call, Foltz told Castleberry he wanted to "go fishing," which he explained to police was code for purchasing methamphetamine. During that call, Castleberry asked Foltz where he was calling from, and Foltz responded that he was "in town." During the second call, Foltz and Castleberry agreed to meet at Peter Pan Park in Emporia.

Based upon these phone calls, police set up video recording equipment at Peter Pan Park, placed a wireless transmitter on Foltz, and gave Foltz $600 to fund the methamphetamine purchase. Then, Foltz drove his pickup truck to the park to meet Castleberry, who also arrived in a vehicle. Foltz got into Castleberry's car, where, according to Foltz' testimony, he gave Castleberry $600 in exchange for a cigarette package containing methamphetamine. When the two parted ways, Foltz returned to the Emporia Police Department with the methamphetamine.

Officer Lance Delgado, driving a marked patrol vehicle, unsuccessfully attempted to stop Castleberry's car as it left the park. Instead of pulling over, Castleberry led officers on a 45-minute, high-speed chase through residential and rural areas of Lyon

County. During the chase, Castleberry disobeyed several stop signs and traffic signals, while driving at speeds ranging from approximately 45 miles per hour to 120 miles per hour.

Highway Patrol Trooper Beau Wallace learned of Castleberry's location and stopped his patrol car in the opposite lane of traffic with the intent of deploying stop sticks to end the chase. Wallace was still in his car when Castleberry's car traveled towards him at 109 miles per hour. As Castleberry approached, he neared the road's centerline, as though he was aiming at Wallace's car. Wallace accelerated into the ditch to get out of Castleberry's path and notified dispatch that Castleberry had tried to hit him.

The pursuit finally ended when law enforcement deployed stop sticks in the path of Castleberry's vehicle, which caused Castleberry to stop before reaching the stop sticks. Immediately upon coming to a stop, Castleberry got out of his vehicle. Four officers pointed their weapons at Castleberry and yelled at him to get down on the ground. Castleberry threw his arm up in the air in what Delgado described as an "almost taunting" or "threatening" motion. Wallace described Castleberry's behavior as antagonistic and aggressive and noted that Castleberry told the officers to shoot him. After approximately 5 to 20 seconds, Delgado tased Castleberry, allowing officers to temporarily subdue him, before Castleberry resumed resisting the officers' attempts to handcuff him.

Based on these events, the State charged Castleberry with one count each of aggravated assault on a law enforcement officer, obstructing legal process or official duty, distribution of methamphetamine, unlawful use of a communication facility, failure to affix a drug tax stamp, fleeing or attempting to elude a law enforcement officer, and reckless driving.

At trial, Castleberry testified in his own defense, denying that he had given Foltz methamphetamine in exchange for money. He contended that his telephone conversation with Foltz was literally about going fishing, as they had done in the past. Castleberry said that on those prior fishing expeditions, he had used the fishing equipment that Foltz kept in his pickup truck. Castleberry explained further that, when the two met at the park, Castleberry was talking to Foltz' girlfriend and handed the telephone to Foltz.

After Foltz spoke with his girlfriend, he announced that he was not ready to fish that day but perhaps they could go the following day.

Castleberry explained that as he left the park, he noticed police officers following him, and he panicked. But he said that during the chase he spoke by telephone with his mother and a friend, who convinced him to stop his car. He further testified that he did not resist arrest, but rather he was unable to place his arms behind his back because of his large body structure and the effects of the taser.

After the close of evidence, the district court granted the State's motion to dismiss the misdemeanor reckless driving charge to avoid a potential issue with convicting Castleberry of both felony fleeing or eluding a police officer and misdemeanor reckless driving. The jury acquitted Castleberry of aggravated assault of a law enforcement officer but found Castleberry guilty of the remaining charges. The district court sentenced Castleberry to a controlling sentence of 61 months' imprisonment.

Castleberry appealed to the Court of Appeals, which affirmed his convictions and sentence. On the venue question, the panel concluded that the State's proof that Foltz originated the call in Lyon County was sufficient evidence to establish venue on the use of a communication facility charge. *Castleberry*, 48 Kan. App. 2d at 477. Although the panel determined that the trial court erred in failing to instruct the jury on the specific underlying moving violations that supported the fleeing and eluding charge, it determined that the error was harmless because all of the traffic offenses described at trial constituted moving violations. 48 Kan. App. 2d at 482. The panel found no error in the district court's failure to provide the jury with a unanimity instruction on the obstruction of official duty charge because Castleberry's conduct was one continuous act, *i.e.*, there were not multiple acts. In the alternative, the panel found that the State effectively elected the act upon which it was relying. 48 Kan. App. 2d at 484-86. The panel rejected Castleberry's argument that the definition of "distribute" provided to the jury established alternative means of committing the crime of distribution of methamphetamine. 48 Kan. App. 2d at 486-89. Finally, the panel rejected Castleberry's due process challenge to the district court's use of his criminal history score to enhance his sen-

tence. 48 Kan. App. 2d at 489. This court granted Castleberry's petition for review.

## PROPER VENUE FOR UNLAWFUL USE OF A COMMUNICATION FACILITY

Castleberry argues that the State failed to establish that venue to prosecute the use of a communication facility charge was proper in Lyon County because the State failed to present sufficient evidence from which a rational jury could infer that Castleberry was physically present in Lyon County during his telephone conversations with Foltz. Rejecting the premise that Castleberry had to be physically present in Lyon County in order to use a communication facility within that county, we deny his venue challenge.

### Standard of Review

Castleberry cites to this court's standard of review for analyzing the sufficiency of the evidence. But before we can determine whether the State's evidence was sufficient to prove the facts necessary to establish Lyon County as a proper venue for the use of a communication facility charge, we must interpret the statute that defines the crime to ascertain where the defendant is deemed to have used the communication facility. Of course, statutory interpretation is a question of law over which appellate courts exercise unlimited review. See *State v. Dale*, 293 Kan. 660, 662, 267 P.3d 743 (2011).

### Analysis

We begin by looking at the statutory definition of the crime of unlawful use of a communication facility contained in K.S.A. 2009 Supp. 21-36a07, which provides, in relevant part:

"(a) It shall be unlawful for any person to knowingly or intentionally *use* any *communication facility*:

(1) In committing, causing, or facilitating the commission of any felony under K.S.A. 2009 Supp. . . . 21-36a05 . . .

. . . .

"(c) As used in this section, 'communication facility' means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures or sounds of all kinds and includes telephone, wire, radio, com-

puter, computer networks, beepers, pagers and all other means of communication." (Emphasis added.)

Castleberry recognizes that the definition of the crime in K.S.A. 2009 Supp. 21-36a07 does not specify a location element. Accordingly, Castleberry's "argument essentially raises the question of whether [Lyon] County was the proper venue for prosecuting him for the crime." See *State v. Kendall*, 300 Kan. 515, 530, 331 P.3d 763 (2014) (citing *State v. Rivera*, 42 Kan. App. 2d 1005, 1008-10, 219 P.3d 1231 [2009], *rev. denied* 290 Kan. 1102 [2010], to explain that "unless specified in statute defining the crime, location of where the crime was committed is generally not an element of the crime; however, venue is a necessary jurisdictional fact that must be proven along with the elements of the actual crime").

Kansas' venue statutes prescribe where the State may prosecute a crime. Pursuant to K.S.A. 22-2602, "[e]xcept as otherwise provided by law, the prosecution shall be in the county where the crime was committed." Under K.S.A. 22-2603, "[w]here two or more acts are requisite to the commission of any crime and such acts occur in different counties the prosecution may be in any county in which any of such acts occur." Accordingly, our first task should be to determine the act or acts Castleberry had to perform in order to commit the crime of unlawful use of a communication facility. Then, we look at where he performed those acts.

Castleberry argues that the State was required to prove what it charged in the complaint, *i.e.*, he was physically present in Lyon County when he used a cell phone to receive the call from Foltz about a drug purchase. Castleberry relies on a prior, unpublished opinion from the Court of Appeals, *State v. Price*, No. 92,012, 2005 WL 823912 (Kan. App.) (unpublished opinion), *rev. denied* 280 Kan. 989 (2005). There, Price was charged in Atchison County with the unlawful use of a communication facility to arrange the sale of a controlled substance. But at trial, the State only presented evidence that the drug purchaser was located in Atchison County during the telephone conversation arranging the sale; the State did not prove that Price was in Atchison County when he received the call. The *Price* panel rejected the State's argument that the pur-

chaser's use of a telephone in Atchison County satisfied K.S.A. 22-2603, reasoning that it was "unpersuaded that [the purchaser's] act [of using an Atchison County telephone to call Price] was an element of Price's crime." 2005 WL 823912, at *3.

While acknowledging the factual similarity to *Price*—that "[t]he record does not indicate whether Castleberry was in Lyon County when he received [the informant's] phone calls," *Castleberry*, 48 Kan. App. 2d at 477—the panel in this case took another tack, reasoning as follows:

"K.S.A. 2009 Supp. 21-36a07(a) states: 'It shall be unlawful for any person to knowingly or intentionally use any communication facility . . . .' In the context of this sentence, the term 'use' is a transitive verb meaning 'to put into action or service.' See Webster's Third New International Dictionary 2523 (1993). As a transitive verb, it requires and places emphasis on an object. See Chicago Manual of Style 172 (15th ed. 2003) ('A transitive verb requires an object to express a complete thought; the verb indicates what action the subject exerts on the object.'). Focus on the object—in this case, a communication facility—is therefore critical to giving full effect to the term 'use.'

"To that end, K.S.A. 2009 Supp. 21-36a07(c) defines 'communication facility' as 'any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures or sounds of all kinds and includes telephone, wire, radio, computer, computer networks, beepers, pagers and all other means of communication.' Reading the two subsections in conjunction with each other, K.S.A. 2009 Supp. 21-36a07(a), (c) makes it unlawful for any person to 'use' any communication instrumentality 'used or useful in the transmission of writing, signs, signals, pictures or sounds of all kinds.' Given the statute specifically requires that the instrumentality be one that is used or useful in transmitting signals and sounds of all kinds, we believe the legislature intended the act of using any communication instrumentality (in this case a cell phone) to include the transmission of information from one party to another. That is, although the act of using a cell phone technically may require only unilateral conduct, the language of the statute substantively requires the act of using that cell phone to be made for purposes of communicating information from one person to another. For venue purposes, then, we conclude as a matter of law that 'use' of a communication facility in violation of K.S.A. 2009 Supp. 21-36a07(a) occurs simultaneously where the parties to the communication are located." 48 Kan. App. 2d at 476-77.

We agree with the Court of Appeals that the term "communication facility" encompasses more than simply physically possessing a telephone. The statutory definition of "communication facility" contains illustrations which can be parsed as including "telephone,

. . . and all other means of communication." K.S.A. 2009 Supp. 21-36a07(c). In other words, it is the use of a communication system to facilitate a drug deal that is the gravamen of the offense. Here, Castleberry knew Foltz was calling him from "in town," *i.e.*, from Emporia, Lyon County, Kansas. Castleberry intentionally used the telephone communication system that was located in part in Lyon County to arrange a drug transaction. Accordingly, venue for the crime of unlawful use of a communication facility was proper in Lyon County.

Our interpretation of K.S.A. 2009 Supp. 21-36a07 is consistent with Corpus Juris Secundum (C.J.S.)'s discussion of a similar federal statute, 21 U.S.C. § 843(b) (2009), which criminalizes the "use [of] any communication facility in committing or in causing or facilitating the commission . . . of . . . a felony . . . ." That treatise explains:

> "The accused need not personally use the facility, and it is sufficient that the accused instructs someone else to do so. *'Use' of a telephone occurs at both ends of the line. Thus, the accused need not initiate the call,* and may violate the statute by receiving outside the United States a call made in the United States. 'Use' includes receiving calls, engaging in nondescript conversations, and hanging up after a busy signal." (Emphasis added.) 86 C.J.S., Telecommunications § 126.

For the proposition that the accused need not initiate the call, C.J.S. cites to *United States v. Davis,* 929 F.2d 554, 559 (10th Cir. 1991), where the Tenth Circuit held that 21 U.S.C. § 843(b) "encompass[es] situations where the defendant *receives* the telephone call from a government informant" and held that "[t]he statute encompasses any use of a communication facility that makes easier the commission of the underlying felony."

For the proposition that "use" occurs at both ends of the telephone line, C.J.S. cites to *United States v. Arias-Villanueva,* 998 F.2d 1491, 1509 (9th Cir.), *cert. denied* 510 U.S. 1001 (1993), *overruled on other grounds by United States v. Jimenez-Ortega,* 472 F.3d 1102 (9th Cir. 2007), where the Ninth Circuit held that venue over the defendant in Oregon was proper even though the defendant was outside of the United States. The court reasoned that "[s]ince under section 843 the 'use' of the telephones was committed both where the call was made and received, venue in

Oregon was proper." *Arias-Villanueva*, 998 F.2d at 1509. See also *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1120 (10th Cir. 2011) (citing *United States v. Goodwin*, No. 09-3316, 433 Fed. Appx. 636, 642, 2011 WL 2006335, *5 [10th Cir. 2011], "Our circuit has previously described venue for an 843[b] offense as being appropriate 'in both the district where the call was made and in the district where it was received.' "); *Andrews v. United States*, 817 F.2d 1277, 1279 (7th Cir. 1987) (holding "section 843[b] proscribes a continuing offense and, as a result, the crime is committed both where the call originates and where it is received"); *United States v. Barnes*, 681 F.2d 717, 724 (11th Cir. 1982) ("a 843[b] offense is 'committed' for venue purposes both in the district where the call was made and in the district where the call was received"). But *cf. United States v. Rodgers*, 575 F. Supp. 246, 247 (N.D. Ill. 1983) (finding government agent's phone call from Chicago to the defendant in the Bahamas did not constitute a "use" of a communication facility under § 843[b] because defendant's use did not occur in the United States; reasoning "[i]t is inconceivable that Congress intended under § 843[b] that a DEA agent may create federal offenses all over the world by simply picking up a telephone in the United States and calling suspected narcotics violators outside the country").

To summarize our holding on this issue, venue to prosecute an alleged drug dealer for the crime of unlawful use of a communication facility is proper in the county where a potential drug purchaser initiates a telephone call to the dealer when the dealer knows the location of the caller and intentionally uses that telephone communication to facilitate the sale of drugs.

### FAILURE TO INSTRUCT ON UNDERLYING MOVING VIOLATIONS SUPPORTING FLEEING OR ATTEMPTING TO ELUDE A POLICE OFFICER

The elements instruction on the fleeing or attempting to elude a police officer charge included the requirement that the jury find beyond a reasonable doubt: "That the defendant engaged in reckless driving or committed five or more moving violations." Castleberry complains that the district court failed to *sua sponte* instruct

the jury as to what constitutes a moving violation for purposes of determining that particular element of the fleeing or attempting to elude charge. The Court of Appeals found that the omission was error but not clearly erroneous because all of the violations described by the police officer were moving violations, *i.e.*, the result would not have been different if the instruction had been given. *Castleberry*, 48 Kan. App. 2d at 481-82. The panel did not discuss whether the inclusion of reckless driving in the elements instruction affects the analysis.

*Standards of Review*

Castleberry did not request that the district court instruct the jury on what constitutes a moving violation; therefore, our standard of review is governed by K.S.A. 22-3414(3) and *State v. Williams*, 295 Kan. 506, 511, 286 P.3d 195 (2012). In *Williams*, we noted that K.S.A. 22-3414(3) imposes a procedural hurdle when a party fails to object to or request a jury instruction:

"K.S.A. 22-3414(3) establishes a preservation rule for instruction claims on appeal. It provides that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included crime instruction, unless: (a) that party objects before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds for objection; or (b) the instruction or the failure to give the instruction is clearly erroneous. If an instruction is clearly erroneous, appellate review is not predicated upon an objection in the district court." 295 Kan. 506, Syl. ¶ 3.

We utilize a two-step process to determine whether an instruction is clearly erroneous:

"First, 'the reviewing court must . . . determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.' 295 Kan. 506, Syl. ¶ 4. If error is found, then we proceed to the second step of assessing whether we are firmly 'convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal.' 295 Kan. 506, Syl. ¶ 5; see also *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013)." *State v. Cruz*, 297 Kan. 1048, 1066-67, 307 P.3d 199 (2013).

In this case, the second step in the analysis includes the additional inquiry as to whether the inclusion of both reckless driving and five or more moving violations created alternative means of committing the offense. "Whether a statute creates alternative means of committing a crime is a matter of statutory interpretation and construction and is a question of law subject to de novo review on appeal." *State v. Betancourt*, 299 Kan. 131, 137, 322 P.3d 353 (2014) (citing *State v. Foster*, 298 Kan. 348, 353, 312 P.3d 364 [2013]).

*Analysis*

The State charged Castleberry with felony fleeing or attempting to elude a police officer. The crime of fleeing or attempting to elude a police officer is set forth at K.S.A. 2009 Supp. 8-1568 and states, in relevant part:

"(a)(1) Any driver of a motor vehicle who willfully fails or refuses to bring such driver's vehicle to a stop for a pursuing police vehicle or police bicycle, when given visual or audible signal to bring the vehicle to a stop, shall be guilty as provided by subsection (c)(1), (2) or (3).

(2) Any driver of a motor vehicle who willfully otherwise flees or attempts to elude a pursuing police vehicle or police bicycle, when given visual or audible signal to bring the vehicle to a stop, shall be guilty as provided by subsection (c)(1), (2) or (3).

(3) It shall be an affirmative defense to any prosecution under paragraph 1 of this subsection that the driver's conduct in violation of such paragraph was caused by such driver's reasonable belief that the vehicle or bicycle pursuing such driver's vehicle is not a police vehicle or police bicycle.

"(b) Any driver of a motor vehicle who willfully fails or refuses to bring such driver's vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle or police bicycle, when given visual or audible signal to bring the vehicle to a stop, and who: (1) *Commits any of the following during a police pursuit: (A) Fails to stop for a police road block; (B) drives around tire deflating devices placed by a police officer; (C) engages in reckless driving as defined by K.S.A. 8-1566 and amendments thereto; (D) is involved in any motor vehicle accident or intentionally causes damage to property; or (E) commits five or more moving violations*; or

(2) is attempting to elude capture for the commission of any felony, shall be guilty as provided in subsection (c)(4).

"(c)(1) Violation of subsection (a), upon a first conviction is a class B nonperson misdemeanor.

"(2) Violation of subsection (a), upon a second conviction is a class A nonperson misdemeanor.

"(3) Violation of subsection (a), upon a third or subsequent conviction is a severity level 9, person felony.

"(4) Violation of subsection (b) is a severity level 9, person felony." (Emphasis added.)

The fleeing or attempting to elude instruction given in this case was modeled after PIK Crim. 3d 70.09 and also included the elements of reckless driving, modeled after PIK Crim. 3d 70.04, to-wit:

"The elements of reckless driving are as follows:
"1. That the defendant was driving a vehicle;
"2. That the defendant was driving in a reckless manner;
"Reckless means driving a vehicle under circumstances that show a realization of the imminence of danger to another person or the property of another where there is a conscious and unjustifiable disregard of that danger."

Under the first step in our analysis, we must determine whether it was error for the district court not to instruct the jury on what constitutes a "moving violation" as that term is used in the fleeing and eluding statute. In *State v. Richardson*, 290 Kan. 176, 180-81, 224 P.3d 553 (2010), we held that because "moving violation" is not defined by the fleeing and eluding statute and "is not a simple matter of common knowledge among jurors," it was error not to instruct the jury on the specific underlying moving violations and their elements. The Court of Appeals relied on *Richardson* to hold that it was erroneous not to instruct the jury on the specific elements of each moving violation at issue in this case. *State v. Castleberry*, 48 Kan. App. 2d 469, 481, 293 P.3d 757 (2013). The State has not cross-petitioned this panel finding and, at oral argument, the State confirmed that it was not challenging the panel's finding of error.

Moving to the second step, we agree with the Court of Appeals' ultimate destination—that the instruction error was not clearly erroneous—albeit we arrive there by a different route. The Court of Appeals found no clear error by determining that all of the offenses described at trial by the police officer constituted moving violations under the definition set forth in K.A.R. 92-52-9(a). 48 Kan. App.

2d at 482. *Richardson* criticized this approach because it would require the appellate court to first choose from among several possible definitions of "moving violation" and then to "step into the shoes of the jurors and convict [the defendant] of five moving violations of our choice." 290 Kan. at 183.

Nevertheless, here we are presented with a different elements instruction than was involved in *Richardson*. Castleberry's jury was also instructed to determine whether he engaged in reckless driving as an option to meet the felony sentencing enhancement element of fleeing or eluding. The district court treated the options—engaging in reckless driving or committing five or more moving violations—as a multiple acts issue. But describing two different ways in which a single crime may be committed creates an alternative means question, not a multiple acts issue. We have described the distinction as follows:

> " ' "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.] In reviewing an alternative means case, the court must determine whether a rational trier of fact *could* have found each means of committing the crime proved beyond a reasonable doubt. [Citations omitted.]
>
> " ' "In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved a reasonable doubt. [Citations omitted.]" [*State v. Kitchen,* 110 Wash. 2d 403, 410, 756 P.2d 105 (1988)].' *State v. Timley,* 255 Kan. 286, 289-90, 875 P.2d 242 (1994)." *State v. Becker,* 290 Kan. 842, 854-55, 235 P.3d 424 (2010), *superseded by statute on other grounds as stated in State v. Todd,* 299 Kan. 263, 323 P.3d 829 (2014).

Engaging in reckless driving or committing five or more moving violations are simply two different ways in which misdemeanor fleeing or attempting to elude can be elevated to a felony. See K.S.A. 2009 Supp. 8-1568(b)(1)(C), (E), and (c)(4). Even if the jury were to find both circumstances—reckless driving and five or more moving violations—Castleberry would have been subject to

but one conviction. Consequently, the addition of the reckless driving language to the elements instruction for the fleeing or attempting to elude charge created an alternative means question.

Two panels of the Court of Appeals have recently reached different conclusions regarding whether the penalty enhancement factors contained in K.S.A. 2009 Supp. 8-1568(b)(1) create alternative means of committing the crime of felony fleeing or attempting to elude a police officer. Most recently, a panel determined that K.S.A. 2009 Supp. 8-1568(b)(1)(C) (reckless driving) and K.S.A. 2009 Supp. 8-1568(b)(1)(D) (motor vehicle accident), did not create alternative means. The panel found these terms are options within a means, as they illustrate "the factual circumstances of the additional act that must occur during a police pursuit to raise the crime's severity level to a felony." *State v. Goodpaster*, No. 108,631, 2014 WL 702395, at *7 (Kan. App.) (unpublished opinion), *petition for rev. filed* March 7, 2014 (pending). Another panel reached the opposite conclusion, holding that K.S.A. 2009 Supp. 8-1568(b)(1)(C) (reckless driving) and K.S.A. 2009 Supp. 8-1568(b)(1)(E) (five or more moving violations) constitute alternative means because "[t]he proof necessary for a conviction of reckless driving or a conviction for the commission of five or more moving violations is mutually exclusive. Neither necessarily requires proof of the other." *State v. Cordovo-Hipolito*, No. 103,793, 2011 WL 3658368, at *2 (Kan. App. 2011) (unpublished opinion), *rev. denied* 293 Kan. 1109 (2012).

Notably, *Cordovo-Hipolito* was filed before this court's decision in *State v. Brown*, 295 Kan. 181, 196-99, 284 P.3d 977 (2012), where this court distinguished between alternative means of committing an offense and optional ways in which the State may prove the gravamen of the offense. See also *Foster*, 298 Kan. 348, Syl. ¶ 4 ("Alternative means are legislatively determined, distinct, material elements of a crime, as opposed to legislative descriptions of the material elements or of the factual circumstances that would prove the crime."). That distinction is germane here. The legislature obviously intended to enhance the severity of the crime where the perpetrator endangered the public safety by the way in which he or she drove his or her vehicle while fleeing or attempting to

elude the police. The State can prove that unsafe vehicle operation by either establishing the definition of "reckless" as applicable to the crime of reckless driving or by establishing that, during the flight, the defendant committed five or more moving violations. Contrary to being mutually exclusive, those proofs would most likely overlap. It is difficult to imagine that a juror would not view the act of running multiple stop signs at speeds exceeding 100 miles per hour as evidence of reckless driving.

In the words of *Brown*, engaging in reckless driving or committing five or more moving violations are "options within means," rather than alternative means. Accordingly, the State was not required to prove both reckless driving and the commission of five or more moving violations. Therefore, it was not clearly erroneous to fail to instruct upon the definition of a moving violation in this case because ample evidence supported one of the options within a means—reckless driving—upon which the jury was instructed.

## MULTIPLE ACTS

Castleberry next argues that the district court's failure to *sua sponte* give a unanimity instruction on the obstruction of official duty charge was clearly erroneous. He contends that he committed two acts that the jury could have relied upon to support his obstruction of official duty conviction: (1) fleeing in his car, and (2) after the car chase ended, resisting officers as they tried to handcuff and arrest him. We disagree.

### Standard of Review

We recently set out the framework and standard of review for analyzing unanimity instruction errors:

"Unanimity instruction errors are reviewed under a three-part framework. First, the reviewing court determines whether a multiple acts case is presented. The threshold question is whether jurors heard evidence of multiple acts, each of which could have supported conviction on a charged crime. *State v. King*, 299 Kan. 372, Syl. ¶ 1, 323 P.3d 1277 (2014). This is a question of law subject to unlimited review. *State v. Santos-Vega*, 299 Kan. 11, 18, 321 P.3d 1 (2014) (citing [*State v.*] *Voyles*, 284 Kan. [239,] 244, 160 P.3d 794 [2007]). If the case is a multiple acts case, the next question is whether error was committed. To avoid error, the State must have informed the jury which act to rely upon or the district court must have instructed the jury to agree on the specific act for each charge.

Failure to elect or instruct is error. Finally, the court determines whether the error was reversible or harmless. *Santos-Vega,* 299 Kan. at 18. When, as here, the defendant failed to request a unanimity instruction, the court applies the clearly erroneous standard provided in K.S.A. 2013 Supp. 22-3414(3). See *Voyles,* 284 Kan. at 252-53. Under this test, to find the error reversible,

" '[A]n appellate court must be firmly convinced that under the facts the jury would have returned a different verdict if the unanimity instruction had been given. See *State v. King,* 297 Kan. 955, 979-80, 305 P.3d 641 (2013); see also *State v. Trujillo,* 296 Kan. 625, 631, 294 P.3d 281 (2013) (noting court's decision to omit the "real possibility" language from *Voyles* test to avoid confusion with the constitutional harmless error test).' *Santos-Vega,* 299 Kan. at 18." *State v. De La Torre,* 300 Kan. 591, 596, 331 P.3d 815, (2014).

*Analysis*

In *De La Torre,* we defined and discussed multiple acts:

" 'Multiple acts' are legally and factually separate incidents that independently satisfy the elements of the charged offense. See *King,* 299 Kan. at 379, 323 P.3d 1277; *State v. Soto,* 299 Kan. 102, 111, 322 P.3d 334 (2014). Incidents are factually separate when independent criminal acts have occurred at different times or different locations or when a criminal act is motivated by a fresh impulse. Factually separate and distinct incidents are not unitary conduct. *King,* 299 Kan. 372, Syl. ¶ 2, 323 P.3d 1277." 300 Kan. at 591.

Additionally, in *State v. Schoonover,* 281 Kan. 453, 507, 133 P.3d 48 (2006), we noted that the factors utilized in determining if there is unitary conduct include:

"(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct."

Castleberry argues that his acts of fleeing in his car and resisting arrest occurred at different locations and that an intervening event—Castleberry stopping his car—broke up his conduct and therefore created a multiple acts scenario. As previously stated, the high-speed vehicle chase ended when law enforcement deployed stop sticks in the path of Castleberry's vehicle, which caused Castleberry to stop his vehicle. Immediately upon coming to a stop, Castleberry got out of his vehicle. Four officers pointed their weapons at Castleberry and yelled at him to get down on the ground. Police described Castleberry's behavior as "almost taunting,"

threatening, antagonistic, and aggressive. After approximately 5 to 20 seconds, Officer Delgado deployed his taser on Castleberry.

The Court of Appeals found "Castleberry's conduct here—fleeing from law enforcement, stopping his vehicle, being tased, and being taken into custody—amounts to one continuous act in which Castleberry substantially hindered or increased the burden of the law enforcement officers who were trying to effect his arrest." *Castleberry*, 48 Kan. App. 2d at 484. The panel compared this factual scenario to *State v. Kesselring*, 279 Kan. 671, 683, 112 P.3d 175 (2005), where this court found that a kidnapping was a continuous incident that could not be factually separated even though the crime took several hours, the victim was moved from one location to another, and the victim was momentarily free when he attempted to escape. See also *State v. Bischoff*, 281 Kan. 195, 201-03, 131 P.3d 531 (2006) (one continuous act of aggravated assault where semi-truck driver harassed victim for 8 miles on highway before following victim onto exit ramp). But *cf. State v. King*, 297 Kan. 955, 981-82, 305 P.3d 641 (2013) (multiple acts were presented where defendant damaged property, left the premises, then returned to do more damage).

Castleberry's situation is more analogous to *Kesserling* and *Bischoff*. The shift in the action was caused by law enforcement's successful termination of the vehicle chase, rather than by Castleberry's fresh impulse to do something different. His attempts to elude arrest were continuous and uninterrupted, even though the resistance evolved from a vehicle chase to a physical altercation. Moreover, if the State had attempted to prosecute Castleberry on two counts of obstruction, it is likely that he would have claimed multiplicity. See *State v. Lemons*, No. 108,894, 2014 WL 4388565, at *3 (Kan. App.) (unpublished opinion), *rev. denied* 303 Kan. 1080 (2015) (on another issue) (reversing one of two convictions for obstructing official duty as multiplicitous on similar facts).

Because Castleberry's actions were all part of one continuous act, unbroken by a fresh impulse, this was not a multiple acts case. Consequently, the district court did not err in failing to give a unanimity instruction.

## ALTERNATIVE MEANS

For his next issue, Castleberry contends that he was charged with alternative means of committing the distribution of methamphetamine charge and that the State presented insufficient evidence to convict him of each of the alternative means. Although Castleberry did not object to the jury instruction in the district court, "[t]he overarching question presented involves the sufficiency of the evidence to support the [distribution of methamphetamine] conviction, which does not require [this court] to engage in a preservation inquiry." *Foster*, 298 Kan. at 352 (citing *State v. Cheffen*, 297 Kan. 689, 699-700, 303 P.3d 1261 [2013]).

### Standard of Review

"Whether a statute creates alternative means of committing a crime is a matter of statutory interpretation and construction and is a question of law subject to de novo review on appeal." *Betancourt*, 299 Kan. at 137 (citing *Foster*, 298 Kan. at 353).

### Analysis

Because an alternative means challenge presents an issue of statutory construction, it is helpful to start with the language of the statute at issue. See *Foster*, 298 Kan. at 353. The legislature defines the crime of unlawful cultivation or distribution of controlled substances, in relevant part as: "(a) It shall be unlawful for any person to cultivate, distribute or possess with the intent to distribute any of the following controlled substances or controlled substance analogs thereof: (1) Opiates, opium or narcotic drugs, or any stimulant . . . ." K.S.A. 2009 Supp. 21-36a05(a)(1).

In turn, the definitions section of Article 36a, crimes involving controlled substances, defines "distribute":

" 'Distribute' means the *actual, constructive or attempted* transfer from one person to another of some item whether or not there is an agency relationship. 'Distribute' includes, but is not limited to, sale, offer for sale or any act that causes some item to be transferred from one person to another. 'Distribute' does not include acts of administering, dispensing or prescribing a controlled substance as authorized by the pharmacy act of the state of Kansas, the uniform controlled substances act, or otherwise authorized by law." (Emphasis added.) K.S.A. 2009 Supp. 21-36a01(d).

Castleberry argues the terms "actual, constructive or attempted" contained in the definition of distribute provided the jury with alternative means by which they could have convicted him of distribution of methamphetamine. Castleberry then asserts that because the State failed to prove an attempted transfer of methamphetamine, his conviction must be vacated. See *Foster*, 298 Kan. at 352-53 (alternative means rule requires super-sufficiency of the evidence).

But the first task, before the sufficiency of the evidence is analyzed, is to determine whether Castleberry was charged with distribution of methamphetamine "by only one statutory means that was susceptible to being proved in different ways, or . . . by [three] or more distinct alternative means by which the legislature has said the crime can be committed." *Foster*, 298 Kan. at 352. As the Court of Appeals pointed out, this court has not previously addressed an alternative means challenge to the definition of distribute contained in K.S.A. 2009 Supp. 21-36a01(d). *Castleberry*, 48 Kan. App. 2d at 487.

As noted, the possible alternative means for committing the crime of distribution of methamphetamine are actually contained in a definitional provision, rather than the crime-defining statute. In *Brown*, we observed that in Washington, which has provided us with persuasive authority on this topic, its caselaw holds that " '[d]efinition statutes [that merely elaborate on elements rather than define the crime] do not create additional alternative means of committing an offense.' " *Brown*, 295 Kan. at 198 (quoting *State v. Linehan*, 147 Wash. 2d 638, 646, 56 P.3d 542 [2002]).

Further, the language employed in our definition statute suggests that the gravamen of the offense is the transfer of the drugs from one person to another and that the listed alternatives are merely "descriptive of [the] factual circumstances" by which the crime may be proved and, therefore, they "signal[] secondary matters not giving rise to an alternative means issue." *Brown*, 295 Kan. at 199.

Castleberry points us to *State v. Stevens*, 285 Kan. 307, 316, 172 P.3d 570 (2007), which found the phrase, "operate or attempt to operate," created alternative means of committing the crime of

driving under the influence (DUI). He contends that *Stevens* stands for the proposition that where a statute criminalizes both the successful completion of a crime and an attempt to commit that crime, the statute necessarily presents alternative means. But subsequent caselaw on the DUI statutory language causes Castleberry's argument to evanesce. In *State v. Ahrens*, 296 Kan. 151, 160, 290 P.3d 629 (2012), we reconsidered *Stevens* in light of *Brown* and held that the phrase "operate or attempt to operate" did not create alternative means of committing a DUI. *Ahrens* opined that "[t]he crime of driving under the influence requires two primary elements—that is, driving and simultaneously being under the influence." 296 Kan. at 160. Accordingly, "the term 'operate' and the phrase 'attempt to operate' merely 'describe the factual circumstances in which a material element'—*i.e.*, driving—'may be proven.' " 296 Kan. at 160 (quoting *Brown*, 295 Kan. at 196-97). Under that rationale, "actual, constructive or attempted" could simply describe the factual circumstances under which a material element—transfer—may be proven.

Persuasively, we have subsequently relied upon *Brown* and *Ahrens* to conclude that the legislature did not intend to create alternative means of committing aggravated intimidation of a witness through the use of the statutory terms " 'preventing or dissuading, or attempting to prevent or dissuade.' " *State v. Aguirre*, 296 Kan. 99, 106-07, 290 P.3d 612 (2012). We held that because the statute only prohibits one distinct type of conduct or *actus reus*, the act of intimidating the witness or victim, the challenged terms did not create alternative means of committing the crime. The panel in this case relied on *Aguirre* when determining that "actual transfer and attempted transfer do not present alternative means of distributing controlled substances," but rather "the statutory definition of 'distribute' lists options within a means, as it merely describes the type of factual circumstances that may prove the material element of 'distribute.' " *Castleberry*, 48 Kan. App. 2d at 488-89. We agree with the panel.

As the Court of Appeals noted, Castleberry concedes that the State presented sufficient evidence that he actually and/or constructively transferred methamphetamine to Foltz. Because the

State was not required to also present evidence the he attempted to transfer methamphetamine, Castleberry's conviction was supported by sufficient evidence and is affirmed.

## CRIMINAL HISTORY

Castleberry finally argues that his rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated because the district court sentenced him to an increased sentence, based upon his prior criminal history, without requiring the State to put his criminal history before a jury and prove it beyond a reasonable doubt.

*Standard of Review*

Castleberry's attack on the constitutionality of the Kansas Sentencing Guidelines Act sentencing grid involves a question of law over which this court has unlimited review. *State v. Ivory,* 273 Kan. 44, 46, 41 P.3d 781 (2002).

*Analysis*

Castleberry's argument relies on *Apprendi v. New Jersey,* 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). But he acknowledges that his argument was specifically rejected by this court in *Ivory,* 273 Kan. at 46-48, and that we have repeatedly confirmed *Ivory*'s holding on numerous occasions thereafter. See, *e.g., State v. Adams,* 294 Kan. 171, 185, 273 P.3d 718 (2012). Castleberry has not advanced any reason for us to revisit *Ivory,* and we decline to do so. The imposition of the enhanced sentence was proper.

Castleberry's convictions and sentence are affirmed.

MICHAEL J. MALONE, Senior Judge, assigned.