NOT DESIGNATED FOR PUBLICATION

No. 127,903

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CARL THOMAS SANDS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; CLINTON LEE, judge. Submitted without oral argument. Opinion filed May 15, 2026. Affirmed.

*Merideth J. Hogan*, of Kansas Appellate Defender Office, for appellant.

*Tyler W. Winslow*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., ATCHESON and CLINE, JJ.

CLINE, J.: Carl Thomas Sands seeks a new trial after being convicted of alternative counts of fleeing or attempting to elude an officer. He claims the district court erred in denying his motion in limine and the prosecutor erred by making improper statements in closing. After reviewing the record, we find the district court did not abuse its discretion in denying Sands' motion because the evidence he sought to exclude was relevant and not unduly prejudicial. And even assuming the prosecutor's statements were erroneous, we find the errors harmless. We therefore affirm the district court's decision and Sands' convictions.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 26, 2022, Richard and Joshua DeMaranville reported to police that they discovered the workshop door of their recently deceased neighbor, Marcus "Mark" Spencer, was open and the lock had been broken. When Richard fixed the lock, he noticed tire tracks on the property and that several items were missing.

The next day, Richard saw strangers pull into Spencer's property in an SUV-type vehicle and a Chevrolet truck pulling an enclosed trailer. Richard called Joshua and told him that they needed to go see what was going on.

When confronted by the DeMaranvilles, the strangers claimed that Marcus Spencer was their uncle and they were coming to clean up the property. But the DeMaranvilles, who had known Spencer for at least 15 years, knew that he did not have any nephews. They also noted that no one ever called Spencer by the name Marcus—he went by his nickname, Mark. Around this time, Sands came from the shop and said, "'It's got a new lock on it already,'" or "'They changed the lock,'" which also made the DeMaranvilles suspicious. One of the strangers then pulled out a gun and pointed it at them, so Richard called 911 and told Joshua to do the same.

As the strangers began to leave, the DeMaranvilles saw Sands get into the truck and start to drive off the property. Although Richard was unsuccessful in his attempt to block the vehicles from leaving the property, Joshua managed to take a picture of the truck with the trailer.

Joshua then called a neighbor, Lynn Looney, for help. Joshua told Looney that the previous intruders had returned to Spencer's property and were shooting at him. So, Looney picked up Joshua and they gave chase.

2

When Looney tried to pull alongside the truck to see if they could read the license plate, the SUV driver began shooting at him. Looney backed off and returned fire but was unsure if he had hit anything. Looney and Joshua continued their chase while on the phone with the 911 dispatcher, informing the dispatcher of the directions that the truck and SUV were traveling.

At one point, Leavenworth County Sheriff's Deputy Adam Munoz spotted the vehicles, activated his lights, and began following the truck. The deputy saw the truck driver run stop signs and lights, speed over 100 miles per hour, and cross over into oncoming traffic. The deputy stopped the chase once the truck crossed into Missouri.

Sergeant Jason Slaughter of the Leavenworth County Sheriff's Office was assigned to investigate the case. He discovered gas station surveillance footage, which showed Sands in the truck roughly one and a half hours before the disturbance at Spencer's property. Using this footage, Slaughter created photos and gave them to other law enforcement contacts, which helped identify Sands through prior mugshots.

After identifying Sands, and about 10 days after the chase, Slaughter watched Sands at his home in Kansas City, Missouri. At one point, Slaughter saw Sands use a key fob to open what appeared to be the truck involved in the chase and drive away. Slaughter asked the Kansas City, Missouri Police Department to stop the truck, which had been reported stolen. When Slaughter recovered the vehicle, the back glass had been shot out.

Before trial, Sands moved to exclude evidence of the theft of the pickup truck, the attempted theft at Spencer's property and gunfire exchange, the gas station surveillance video, eyewitness identification of Sands on Spencer's property, and Sergeant Slaughter's testimony about Sands' later possession of the truck. He argued that this evidence was

3

unduly prejudicial and irrelevant because none of it was relevant to the elements of the crime of fleeing and eluding.

The district court granted the motion in part and denied it in part, finding that the State would be prohibited from introducing evidence that Sands stole the truck, but the State could present evidence that the truck was reported stolen. The court found the remaining evidence at issue was all admissible to the extent that the identity of the truck's driver during the chase was controverted. The district court explicitly found the evidence was relevant and not so prejudicial that it outweighed the probative value.

Sands went to trial and the jury ultimately found him guilty of fleeing or attempting to elude a police officer by driving the wrong way in traffic, and guilty of fleeing or attempting to elude a police officer by driving in a reckless manner. Since these convictions were considered alternative, the district court merged the two resulting in Sands being convicted of a severity level 7 person felony. Sands was ultimately sentenced to the aggravated sentence for that crime of 31 months in prison.

REVIEW OF SANDS' APPELLATE CHALLENGES

I. *Did the district court err in denying Sands' motion in limine?*

To begin, Sands renews his argument that the evidence he sought to exclude was irrelevant to the charged crimes and unduly prejudicial. The State counters that this evidence is material because Sands put his identity at issue, and the evidence tends to show that Sands was the person driving the truck while fleeing and eluding Deputy Munoz. It also alleges the evidence was not unduly prejudicial.

4

*Sands failed to preserve his objection to evidence of the prior theft and gunfire.*

K.S.A. 60-404, referred to as the contemporaneous objection rule, provides that an appellate court cannot review an evidentiary challenge absent a timely and specific objection on the record. Under this rule, any pretrial objection to the admission or exclusion of evidence must be preserved by contemporaneously objecting at trial. *State v. Showalter*, 318 Kan. 338, 345, 543 P.3d 508 (2024). "Kansas appellate courts have sometimes declined to strictly apply the contemporaneous objection rule in certain contexts, but only after finding the underlying purpose for the rule has been satisfied." 318 Kan. at 346.

The State asks us to find this issue partially unpreserved because Sands failed to renew his objections at trial to some of the evidence—namely, the prior theft at Spencer's property and the gunfire exchange between the DeMaranvilles and Sands' accomplices. In addition to failing to object when this evidence was introduced, the State also asserts that Sands invited the error regarding the discussion of gunfire because he brought it up first.

In his reply brief, Sands admitted that he did not object to Richard's testimony about the prior theft, but he contends that he preserved his objection to the admission of this evidence because he objected to Joshua's later testimony about the incident. Sands did not respond to the State's allegation that he failed to preserve his objection to the discussion of gunfire.

As for evidence of the gunfire exchange, we find Sands did not preserve his objection. Not only did he fail to contemporaneously object to this evidence at trial but he opened the door to its admission by bringing it up first in his opening statement and again when cross-examining Joshua. Generally, a litigant may not invite error and then complain of that error on appeal. *State v. Slusser*, 317 Kan. 174, 179, 527 P.3d 565 (2023).

We also find Sands failed to preserve his objection to evidence of the prior theft because he did not object when Richard testified about it. The purpose of the contemporaneous objection rule codified in K.S.A. 60-404 is to allow the district court the opportunity to conduct the trial without using improper evidence. See *State v. Kelly*, 295 Kan. 587, 589, 285 P.3d 1026 (2012). It also allows the court to preliminarily rule on evidence before trial, but after hearing how the evidence unfolds during trial, to be prepared to reconsider that ruling if a timely objection is interposed. This flexibility is important because the materiality of evidence may not become apparent until other evidence is admitted or the court sees more context at trial. 295 Kan. at 590. Or, as with the gunfire evidence, the party who originally objected to the admission of the evidence may change their mind and then introduce the evidence themselves.

At trial, Richard testified before Joshua. While Sands calls Richard's testimony on this point "vague"—implying a failure to object because it was not obvious that Richard was testifying about the prior theft—we disagree. Richard and Joshua were basically asked the same question: to describe the nature of the incident that occurred the day before on Spencer's property. Richard was also asked whether he reported this incident to the police to which he said yes, and he described how he discovered missing items and new tracks in the grass. Richard was clearly testifying about the prior theft. Because Sands lodged no objection to this line of questioning or testimony, he signified his acquiescence to the district court's in limine order. Although he objected when Joshua was asked later about the same incident, that objection was too late. The jury had already heard evidence about the prior theft, and Sands had already waived any objection he had to the admission of this evidence.

*The evidence Sands sought to exclude was relevant and admissible.*

Before we examine the admissibility of each category of evidence Sands objected to, we must explain the rules governing the district court's decision and our review of that

decision. The admission of evidence involves several considerations, including determining its relevance; identifying and applying any pertinent legal principles such as the rules of evidence; and weighing the prejudicial impact of the evidence against its probative value. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021).

In the first step, the district court must determine the relevance of the challenged evidence. Relevant evidence is defined in K.S.A. 60-401(b) as "'evidence having any tendency in reason to prove any material fact.'" 313 Kan. at 237. Thus, relevance has two elements: a probative element and a materiality element. 313 Kan. at 237.

Evidence is probative if it tends to make a fact more or less probable. *State v. Alfaro-Valleda*, 314 Kan. 526, 533, 502 P.3d 66 (2022). And materiality generally means the fact the evidence is designed to prove matters to or bears on the decision to be made in a case. 314 Kan. at 533. Thus, in assessing the probative value of evidence, we measure its quality in proving or disproving a fact. And we measure the materiality of evidence by considering the importance of the fact the evidence relates to. The district court's determination that the evidence is material is subject to de novo review. *State v. Knox*, 301 Kan. 671, 688, 347 P.3d 656 (2015). And its determination that the evidence is probative is reviewed under an abuse of discretion standard. *Alfaro-Valleda*, 314 Kan. at 533.

If the evidence is relevant, the court must then determine which rules of evidence or other legal principles govern the admission of that evidence. Appellate review of the district court's application of the pertinent legal rules and principles depends on whether the rule or principle permits the district court to exercise its discretion or whether the rule raises questions of law subject to de novo review. *State v. Frierson*, 298 Kan. 1005, 1015, 319 P.3d 515 (2014).

Finally, an analysis under K.S.A. 60-445 may be required. Under this inquiry we look at whether a district court abused its discretion in determining whether the probative value of the evidence is substantially outweighed by the risk that its admission will unfairly or harmfully surprise a party who has not had reasonable opportunity to anticipate the evidence. 298 Kan. at 1015-16.

After providing this context, we apply these principles to the evidence at issue.

### Prior Theft at Spencer Property

Sands first challenges the relevance of the DeMaranvilles' discovery of a theft at Spencer's workshop the day before they encountered strangers on Spencer's property. Sands contends this evidence is not probative of any fact material to this case because he was charged with fleeing and eluding a law enforcement officer, not theft. Although we find Sands did not preserve his objection to this evidence, even assuming he did, we find the district court did not err in denying his motion to exclude it. Richard testified the prior theft was a reason he believed the strangers who arrived the next day were engaged in something improper—especially after Sands commented that the shop had a new lock on it already—and why Richard called 911. And Joshua testified the prior theft was why he and Richard were on "high alert" and noticed the strangers who came onto Spencer's property the next day.

Thus, this evidence provides context for how the police became involved and gives a motive for why Sands would have fled from police. It also bolsters the DeMaranvilles' identification of Sands as the person who drove the truck away from the Spencer property right before the police chase that led to the charges at issue. For these reasons, we find evidence of the prior theft was both material and probative.

*Gunfire Exchange at Spencer Property*

Next, Sands contends that evidence of his accomplice's exchange of gunfire with the DeMaranvilles at the Spencer property and during the chase was irrelevant to the charged crimes and whether Sands was driving the truck. But, as mentioned, Sands waived this argument by failing to object to this evidence at trial and, more importantly, introducing the evidence himself. Sands mentioned the gunfire several times—in opening statement, closing argument, and in cross-examining Joshua—in an attempt to impeach the credibility of the DeMaranvilles' identification of him as the truck's driver. Sands cannot complain about the admission of evidence he introduced to bolster his defense.

Even so, we also find this evidence relevant. The discussion of the gunfire exchange helps confirm that the truck later found in Sands' possession was the one involved in the police chase because the back window had been shot out between the time that it was observed on the gas station surveillance footage before the incident and when it was located in Sands' possession a week or so later. While Sands correctly notes that Looney's admission that he did not know whether he hit anything when he fired back impacts the probative value of the evidence, it does not undercut that probative value to the extent that it renders the evidence irrelevant.

*Evidence of Sands' Possession of the Truck Before and After the Incident*

Sands also challenges the relevancy of the gas station surveillance footage which showed him driving the truck involved in the charged crimes before the incident and evidence that he possessed the truck 10 days after the incident. He contends that just because he was driving the truck a few hours before or had the truck days later does not establish that he was driving the truck during the police pursuit. He points out that he was with a woman at the gas station and then says "no one testified that he got into the driver's seat when leaving" the Spencer property.

9

To begin, Sands' remarks about the woman at the gas station and the verbiage used by the eyewitnesses who identified him on the Spencer property appear beside the point and misleading. No one testified that a woman was among the intruders. Instead, they testified the intruders identified themselves as Spencer's nephews. And although the DeMaranvilles did not use the term "driver's seat," they both testified that Sands was driving the truck when the intruders left the Spencer property. During trial, Richard testified:

> "Q   And the individual who was walking away from the shop, were you able to see what vehicle he was driving?
> "A   I seen [*sic*] him jump in the extended cab Chevy pickup.
> "Q   And do you see that person in the courtroom today?
> "A   Yes, I do.
> "Q   Could you point to him and describe what he's wearing?
> "A   The light blue shirt.
>       "MR. HOSSINEI: Let the record reflect, the witness has identified the defendant."

Joshua testified to the same:

> "Q   Do you believe there's any way there was somebody other than the defendant driving that truck when you took that picture?
> "A   No.
> . . . .
> "Q   Is there any doubt whatsoever in your mind that the defendant who's here today is the person who got into that black truck pulling the trailer that you took a picture of?
> "A   There's no doubt. It's him."

Secondly, Sands sets the admissibility bar too high. Evidence can still be relevant even though it is circumstantial and, in fact, circumstantial evidence can support a conviction of even the most serious offense. *State v. Stuart*, 319 Kan. 633, 639, 556 P.3d

872 (2024). The gas station footage—showing Sands driving the truck as recently as an hour and a half before the incident—provides a basis from which a jury could reasonably infer that Sands was driving the truck during the incident. Likewise, Seargeant Slaughter's testimony that he saw the truck parked in Sands' driveway and saw Sands use a key fob to unlock the truck's door, get into its driver's seat, and then drive away is also circumstantial evidence that Sands was driving the truck during the chase.

The law does not differentiate between the probative values of direct evidence (like the DeMaranvilles' eyewitness testimony) and circumstantial evidence (like the gas station surveillance footage); it treats both as having similar weight in proving relevant facts. 319 Kan. at 639. Identity was a disputed material fact at trial. And evidence that Sands was driving the truck both before and after the incident tends to prove he was driving the truck during the incident. We therefore find this evidence relevant and admissible.

*The evidence Sands sought to exclude was not more prejudicial than probative.*

Finally, Sands argues that even if all the evidence he sought to exclude was relevant, its probative value was substantially outweighed by its potential to produce undue prejudice. "But nearly all evidence the State presents in a criminal case will be prejudicial against a defendant, so the proper inquiry is whether the risk of unfair or undue prejudice substantially outweighed the evidence's probative value." *State v. Thurber*, 308 Kan. 140, 202, 420 P.3d 389 (2018).

As mentioned, we review the district court's weighing of probative value and prejudice for an abuse of discretion. *Alfaro-Valleda*, 314 Kan. at 535. When considering undue prejudice, courts consider several factors, including: (1) the potential for the evidence to cause an improperly based verdict; (2) whether the evidence distracts from

11

the central issue in the case; and (3) how time consuming the evidence will be. *State v. Boysaw*, 309 Kan. 526, Syl. ¶ 9, 439 P.3d 909 (2019).

Sands argues that the introduction of evidence about the previous theft at the Spencer property motivated the jury to punish Sands for the uncharged conduct as opposed to the charged conduct, which was fleeing and eluding. Similarly, Sands asserts that evidence of the gunfire exchange only served to inflame the passions of the jury against him because of the inherent violence associated with that behavior.

Again, assuming Sands preserved his objections to this evidence, we do not find it unduly prejudicial. As the State succinctly puts it, Sands "argues that the jury should not hear any evidence other than the fact that an unidentified truck, with an unidentified driver, failed to pull over when law enforcement attempted to initiate a stop." The State submits that this is unreasonable and we agree. As the district court noted, there was no fair way to piecemeal evidence of these events as they unfolded; they were all part of a continuous situation. No one testified Sands fired a weapon or directly accused Sands of taking anything from the Spencer property. This evidence was brief and provided as context for the charged crime—to explain why the driver would have fled or eluded law enforcement and to identify that driver. While it may have been prejudicial, we do not find it unduly so.

As for Sands' possession of the truck earlier in the day and several days later, the only argument Sands makes is that he believes this "confused" the jury into thinking he was driving the truck during the chase. But we do not see the potential for confusion. Sands seems to be arguing that the jury could have mistakenly believed the footage they were shown was of Sands driving during the chase, but this seems far-fetched. It is hard to believe the jury would mistake footage of Sands at a gas station or in his driveway for footage of him driving while being chased by law enforcement. And both witnesses who testified about observing Sands with the truck before and after the chase were clear about

12

the time frames of their observations, which the State also emphasized when discussing this evidence in its closing argument. This evidence was offered to circumstantially establish Sands was the driver during the chase. In other words, since he was driving the truck both before and after the chase, it was more likely that he was driving the truck during the chase. Sands does not show a reasonable probability that the jury was unable to understand the nature or purpose of this evidence.

Because the disputed evidence was relevant, and Sands did not demonstrate that any of it was substantially more prejudicial than probative, the district court did not err in denying Sands' motion in limine.

## II. *Did the prosecutor's statements during closing argument amount to reversible error?*

For his next challenge, Sands argues that the prosecutor erred in closing by giving his personal opinion about controverted evidence through "'we know'" and "'there's no question'" statements and by calling Sands' behavior reckless. The State concedes one of the statements was in error but, for our purposes, we will presume all the statements were erroneous. Even so, we do not find these presumed errors prejudiced the jury.

### *Standard of Review*

Appellate courts use a two-step process to evaluate claims of prosecutorial error. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022). First, we must determine whether the prosecutor erred. If so, we then consider whether that error prejudiced the jury against the defendant and denied the defendant a fair trial. See *State v. Crawford*, 300 Kan. 740, 744, 334 P.3d 311 (2014). But prosecutorial error is harmless if the State can demonstrate beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

*The prosecutor's statements were harmless.*

Sands challenges several statements made by the prosecutor in closing, arguing that collectively they prejudiced the jury. First, he notes the prosecutor said, "I think the mere fact that he had hit speeds of a hundred miles an hour while entering into town, that alone would suffice this was reckless driving." And he correctly characterizes this statement as an improper expression of Sands' guilt by the prosecutor. While we agree this remark was erroneous, we find it substantially harmless because it merely verbalizes a common-sense thought and if it was not one that the jury agreed with, they could simply reject it. See *State v. Castleberry*, 301 Kan. 170, 185, 339 P.3d 795 (2014) ("It is difficult to imagine that a juror would not view the act of running multiple stop signs at speeds exceeding 100 miles per hour as evidence of reckless driving.").

Sands then identifies two statements where he claims the prosecutor was improperly expressing his personal opinion about whether the evidence showed Sands was driving the truck during the chase. First, when the prosecutor said, "'There's no question [Sands] was the driver of that truck,'" and second, when he said, "'[W]e know that's the same truck because Sergeant Slaughter testified, the back window of the truck had been shot out.'"

A prosecutor's use of "we know" statements are improper when based on inferences drawn from controverted evidence—even if the inference is reasonable. *State v. Blevins*, 313 Kan. 413, 432-33, 485 P.3d 1175 (2021). While we presume the prosecutor erred here in making these statements, when taken in context, we find them to be harmless.

As to the first statement, the full context is as follows:

14

"It is correct that Deputy Munoz did not identify the driver. It was only because that Mr. Looney and Josh being in pursuit of the truck and splitting off only once they saw the deputy that allows us to assert to you that it was Mr. Sands driving that truck. We have two witnesses who saw him get in that truck. Whether it was a couple of minutes or several minutes, we heard from Josh that the light was still pretty good. We heard he doesn't have issues with his vision. We heard from Richard, he doesn't have issues with his vision. They both, without hesitation, identified the defendant, Mr. Sands, as the person who they saw there. They both said he was the person at the door of Mr. Spencer's shop that they had just repaired, and both testified that it was Mr. Sands who got into that Chevy truck that was pulling the trailer. There's no question he was the driver of that truck."

Before providing his opinion, the prosecutor gave a fair summary of the evidence, even acknowledging the gaps in the evidence and Sands' defense that he was not the driver. And the jurors were instructed on attorney statements during deliberations. Jury instruction No. 4 provided that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by the evidence, they should be disregarded." The jurors were also given the credibility instruction, which reminds them that they must determine the weight and credit to be given to each witness' testimony and tells them they have a right to use their common knowledge and experience in regard to the matters on which the witnesses testified. So they knew the prosecutor's statements were not evidence and they knew it was their job—not the prosecutor's—to judge the credibility of all the testimony and determine for themselves whether Sands was the driver. We presume the jurors followed these instructions. *State v. Reid*, 286 Kan. 494, 521, 186 P.3d 713 (2008).

Next, the statement, "we know that's the same truck because as Sergeant Slaughter testified, the back window of the truck had been shot out," when taken in context also provides sufficient clarity to render the prosecutor's error harmless:

15

"And regarding Sergeant Slaughter and the investigation that he conducted in identifying Mr. Sands, locating his residence, and then seeing the truck at Mr. Sands' address. I think—I—strike that. The evidence, according to Sergeant Slaughter's testimony, is that the truck was parked at Mr. Sands' address in Kansas City, Missouri. And if it was ten or so days after the fact, that is more likely to show that it was Mr. Sands driving that truck.

"And, furthermore, we know that's the same truck because as Sergeant Slaughter testified, the back window of the truck had been shot out. We heard testimony from Mr. Looney that when he was fired at, he shot back. He didn't know if he hit anything. There was a trailer, after all, in between him and that truck, but it's up to you to determine whether one of the shots fired by Mr. Looney was what caused that back window to be shot out. It was Mr. Sands who was in possession of that truck ten or so days later. And the video that Mr. Slaughter obtained from QuikTrip which had—what was from an hour, hour and a half or so prior to the incident at this property, that video, as Sergeant Slaughter testified, showed the rear window of the truck intact."

Again, the prosecutor placed the duty to make factual findings in the hands of the jurors. He told them, "it's up to you to determine whether one of the shots fired by Mr. Looney was what caused that back window to be shot out." And given the weight of the evidence that Sands was driving the truck during the chase, we are not convinced these presumed erroneous statements prejudiced the jury's verdict. See *State v. Cherry*, 320 Kan. 784, 793, 571 P.3d 976 (2025) (finding erroneous prosecutor "'we know'" statements harmless in light of the entire record because of the overwhelming weight of the evidence against the defendant).

The last remark Sands challenges is when the prosecutor said:

"[W]e heard testimony from Deputy Munoz that he activated his siren and he activated his overhead lights. And at one point, he was within four car lengths of the truck. *Th—there is no question* that that element is met." (Emphasis added.)

16

The prosecutor was talking about the second element of the fleeing and eluding crimes Sands was charged with, which required the State to prove that Sands was given a visual or audible signal by a police officer to bring the motor vehicle to a stop during the chase. Once more, we presume this statement was also made in error because "there is no question" statements are also improper when based on inferences drawn from controverted evidence. See *Blevins*, 313 Kan. at 432-33. But we also find this statement to be harmless.

Both sides discussed the credibility of the evidence on this point in closing. In Sands' closing, he reminded the jurors that while Deputy Munoz testified his lights and sirens were activated, there was no patrol car video to back that up. And the State acknowledged that this point turned on the credibility of Deputy Munoz' testimony in its rebuttal closing. Likewise, the State reminded the jurors that the ultimate decisions of whether the jurors believed Deputy Munoz and whether they believed Sands was guilty based on the evidence was up to them. If the jury believed Deputy Munoz, then this element would be met. And, again, the jurors were instructed the prosecutor's statements were not evidence and it was up to the jurors to determine the credibility of the evidence and the guilt of the defendant.

Therefore, although we presume the prosecutor's statements were made in error, we find the errors harmless based on the jury's ability to consider the information independently, the clear instructions by the judge, and the evidence presented at trial. In other words, the State has demonstrated beyond a reasonable doubt that the errors complained of did not affect the outcome of the trial in light of the entire record.

Affirmed.